# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff**, | |
| **v.** | **Civil Action No.** 3:23-cv-00567-JRK |
| **DIESEL SPEC INC.,** | Hon. James R. Knepp II |
| **Defendant**. | |

## ANSWER AND AFFIRMATIVE DEFENSES OF DIÉSEL SPEC INC. TO THE COMPLAINT OF THE UNITED STATES OF AMERICA

Diésel Spec Inc. (Diésel Spec), by and through its undersigned counsel, hereby asserts its Answer and Affirmative Defenses to the Complaint of Plaintiff the United States of America (the "Government").

## I. NATURE OF THE CASE

1.      This is a civil action brought under 42 U.S.C. §§ 7522-24, seeking preliminary and permanent injunctive relief and civil penalties against Diesel Spec Inc. ("Diesel Spec") for violations of the Clean Air Act ("CAA") related to Defendant's sale, offering to sell, and installation of aftermarket products that bypass, defeat, or render inoperative emission controls installed on motor vehicles, motor vehicle engines, nonroad vehicles, and nonroad engines located in the United States in violation of the CAA (herein referred to as "Defeat Devices").

**ANSWER:**    Diésel Spec admits that the Complaint purports to state a cause of action under 42 U.S.C. §§ 7522-24 for alleged violations of the CAA. Diésel Spec denies the remainder of the allegations in Paragraph 1.

2.      As alleged in this Complaint, Defendant, individually and through its network of distributors, has put the public health at risk by selling and installing thousands of Defeat Devices through a network of more than 400 distributors across North America.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 2, including, but not limited to, the Government's use of the term "Defeat Device," which is a term of art seemingly created by the Government and not utilized by Diésel Spec.

3.     Diesel Spec's website (www.dieselspec.com) displays (or displayed) the following image, which is a map that identifies a significant number of Defendant's distributors located in North America, including in the United States:



**ANSWER:**     Diésel Spec admits that the image contained in Paragraph 3 was displayed on its website. Answering further, Diésel Spec denies that any similar image on its website at any time was intended to identify its distributors.

4.     Defendant installed, individually and through its network of distributors, Defeat Devices on certified motor vehicles and engines in the United States in violation of 42 U.S.C. § 7522(a)(3).

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 4.

5.     Diesel Spec's website boasts (or boasted) that, "Diesel Spec is the leader in truck diesel engine ECM tuning technology. With over 50,000 medium and heavy diesel truck tuning performed, Diesel Spec has built its reputation with countless satisfied customers all over the world."

**ANSWER:**     Diésel Spec admits that the quoted text contained in Paragraph 5 appeared on its website, but denies the remaining allegations in Paragraph 5.

6.     Defendant installed, individually and through its network of distributors, Defeat Devices on certified nonroad vehicles and engines in the United States in violation of 40 C.F.R. § 1068.101(b).

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 6.


7.    On Diesel Spec's Construction and Agricultural Division websites (www.dieselspec-construction.com and www.dieselspec-agriculture.com), it boasts (or boasted) that it is "the leader in ECM tuning technology for agricultural equipment and heavy trucks diesel engines. With over 25,000 tuning performed . . ."

**ANSWER:**    Diésel Spec admits that the quoted text contained in Paragraph 7 appears to be an accurate description of statements from its website but denies the remaining allegations in Paragraph 7.


8.    Disabling emissions controls from vehicles and engines presents a serious threat to human health because vehicle emissions are linked to serious illnesses including heart and lung disease, heart attacks, aggravated asthma, and can even cause premature death. To prevent this threat, the CAA imposes stringent standards for the emission of air pollutants from vehicles and engines and prohibits the manufacture, sale, and installation of any device intended to disable emissions controls designed to comply with those emissions standards. 42 U.S.C. §§ 7521(a), 7522(a).

**ANSWER:**    Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations contained in the first sentence of Paragraph 8, and therefore denies such allegations on that basis. With respect to the second sentence of Paragraph 8, Diésel Spec admits only that the CAA is a statute which speaks for itself and denies the remaining allegations in Paragraph 8.


9.    In addition to Defendant's sale and installation of Defeat Devices on motor vehicle engines and nonroad engines, Defendant has refused to provide the Government basic information about the sale and use of its products, in violation of 42 U.S.C. § 7522(a)(2)(A).

**ANSWER:**    Paragraph 9 states a legal conclusion to which no response is required. To the extent an answer is required, Diésel Spec denies the allegations in Paragraph 9.


## II.  JURISDICTION AND VENUE

10.    This action is brought by the United States under the Clean Air Act, 42 U.S.C. §§ 7522-24. This Court has subject matter jurisdiction over Clean Air Act claims pursuant to 42

U.S.C. §§ 7523 and 7524, and 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), and 1355 (Fine, Penalty, or Forfeiture).

**ANSWER:**    Without admitting the Government's claims under the CAA are viable, Diésel Spec admits that this Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 7523 and 7524, 28 U.S.C. §§ 1331, 1345, and 1355. Diésel Spec denies the remaining allegations in Paragraph 10.


    11.    This court has personal jurisdiction over the parties pursuant to Federal Rule of Civil Procedure Rule 4(k)(1) because Defendant is subject to the personal jurisdiction of the State of Ohio in accordance with Section 2307.382(A)(1) of the Ohio Code and Ohio Rule of Civil Procedure 4.2 because the claims arise from Defendant's transaction of business in the State.

**ANSWER:**    Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec, and therefore its relevant conduct has been confined to Québec. Accordingly, Diésel Spec denies the allegations in Paragraph 11.


    12.    In the alternative, this Court has personal jurisdiction over the parties to this action pursuant to Federal Rule of Civil Procedure Rule 4(k)(2) because Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the United States Constitution and laws.

**ANSWER:**    Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec and therefore its relevant conduct has been confined to Québec. Accordingly, Diésel Spec denies the allegations in Paragraph 12.


    13.    Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2), and 1395(a), as well as 42 U.S.C. §§ 7523 and 7524, because it is a judicial district in which Defendant is doing business and where a substantial part of the alleged violations in the Complaint occurred.

**ANSWER:**    Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec and therefore its relevant conduct has been confined to Québec. Accordingly, Diésel Spec denies the allegations in Paragraph 13.

## III. **DEFENDANT**

14.     Diesel Spec is a corporation with its principal office at 200 Goyer, La Prairie, Quebec, J5R 5G5, Canada.

**ANSWER:**     Diésel Spec admits that Paragraph 14 accurately states the company's address and

that it is a Québec corporation but denies the remaining allegations in Paragraph 14. Answering

further, Diésel Spec states that it has only one office.


15.     Defendant is a "person" within the meaning of 42 U.S.C. § 7602(e).

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 15.


## IV. **LEGAL BACKGROUND**

16.     This action arises under Title II of the CAA, as amended, 42 U.S.C. §§ 7521-90, and the regulations promulgated thereunder relating to the control of emissions of air pollution from motor vehicles, motor vehicle engines, nonroad engines, and nonroad vehicles.

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 16.


### A.     **Statutory and Regulatory Overview**

17.     In creating the CAA, Congress found that "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare..."  42 U.S.C. § 7401(a)(2). Congress's purpose in creating the CAA was, among other things, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

**ANSWER:**     Diésel Spec admits that Paragraph 17 sets forth, in part, the language contained in

42 U.S.C. §§  7401(a)(2) and 7401(b)(1), and denies the remaining allegations in Paragraph 17.


18.     "Motor vehicle" is defined in the CAA as "any self-propelled vehicle designed for transporting persons or property on a street or highway." 42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 18.

19.     Under 42 U.S.C. § 7550(10), a "nonroad engine" is "an internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition, or that is not subject to standards promulgated under section 7411 of this title or section 7521 of this title." 42 U.S.C. § 7550(10).

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 19.


20.     Under 42 U.S.C. § 7550(11), a "nonroad vehicle" is a "vehicle that is powered by a nonroad engine and that is not a motor vehicle or a vehicle used solely for competition." 42 U.S.C. § 7550(11).

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 20.


21.     Title II of the CAA and the regulations promulgated thereunder establish standards for the emissions of air pollutants from motor vehicles and motor vehicle engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). These pollutants include nitrogen oxides ("NO."), particulate matter ("PM"), non-methane hydrocarbons ("NMHCs"), and carbon monoxide ("CO"). 42 U.S.C. § 7521(a)(3)(A).

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7521(a) is a statutory provision which speaks for itself and denies the remaining allegations in Paragraph 21.


22.     Additionally, 42 U.S.C. § 7547(a)(3) requires EPA to promulgate standards for nonroad engines and vehicles that will achieve the greatest degree of emission reduction available and requires that EPA consider standards equivalent in stringency to those applicable to motor vehicles. 42 U.S.C. § 7547(a)(3).

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7547(a)(3) is a statutory provision which speaks for itself and denies the remaining allegations in Paragraph 22.


23.     EPA has also established National Ambient Air Quality Standards for certain pollutants, including ozone, NOR, PM, and CO. *See* 40 C.F.R. §§ 50.1-50.19.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 23, and therefore denies such allegations on that basis.

24.     Ozone (ground level) is a highly reactive gas that is formed in the atmosphere from emissions of other pollutants, including emissions from motor vehicles.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 24, and therefore denies such allegations on that basis.

25.     PM is a form of air pollution composed of microscopic solids and liquids suspended in air. PM is emitted directly from motor vehicles and is also formed in the atmosphere from other pollutants, including pollutants emitted from motor vehicles.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 25, and therefore denies such allegations on that basis.

26.     $NO_x$ and NMHCs are reactive gases that contribute to the formation of ozone and PM.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 26, and therefore denies such allegations on that basis.

27.     Exposure to ozone and PM is linked to respiratory and cardiovascular health problems as well as premature death. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to ozone or PM exposure.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 27, and therefore denies such allegations on that basis.

28.     CO is a toxic gas that forms when the carbon in fuel does not burn completely. CO is harmful to human health because it reduces oxygen delivery to the body's organs and tissues. CO can cause headaches, dizziness, vomiting, nausea, loss of consciousness, and death. Long-term exposure to CO has been associated with an increased risk of heart disease.

**ANSWER:**     Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 28, and therefore denies such allegations on that basis.

### B.    EPA's Certificate of Conformity Program for New Motor Vehicles and Motor Vehicle Engines

29.    Manufacturers of new motor vehicles or motor vehicle engines must apply for and obtain a certificate of conformity ("COC") from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new motor vehicle or motor vehicle engine in the United States. 42 U.S.C. § 7522(a)(1).

**ANSWER:**    Diésel Spec admits only that 42 U.S.C. § 7522(a)(1) is a statutory provision which speaks for itself, and denies the remaining allegations in Paragraph 29, including any allegation that Diésel Spec is a manufacturer of motor vehicles or motor vehicle engines.

30.    To obtain a COC, the original equipment manufacturer ("OEM") must demonstrate that the motor vehicle or motor vehicle engine will conform to established emissions standards for NON, PM, NMHCs, and CO, and other pollutants during the motor vehicle or motor vehicle engine's useful life. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

**ANSWER:**    Diésel Spec admits only that 42 U.S.C. § 7525(a)(2) is a statutory provision and 40 C.F.R. §§ 86.007-30(a)(1)(i) and 86.1848-01(a)(1) are regulatory provisions which speak for themselves and denies the remaining allegations in Paragraph 30.

31.    The COC application must include a description of the motor vehicle's emission control system and fuel system components. 40 C.F.R. §§ 86.094-21(b)(1), 86.1844-01(d)-(e).

**ANSWER:**    Diésel Spec admits only that 40 C.F.R. §§ 86.094-21(b)(1) and 86.1844-01(d)-(e) are regulatory provisions which speak for themselves and denies the remaining allegations in Paragraph 31.

32.    Once issued by EPA, a COC covers only those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the COC application for such vehicles or engines. 40 C.F.R. § 86.1848-01(c)(6).

**ANSWER:**    Diésel Spec admits only that 40 C.F.R. § 86.1848-01(c)(6) is a regulatory provision which speaks for itself and denies the remaining allegations in Paragraph 32.

### C.  EPA's Certificate of Conformity Program for Nonroad Compression-Ignition (Diesel) Engines

33.     Manufacturers of new nonroad compression-ignition engines must apply for and obtain a COC from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new nonroad compression-ignition engine in the United States. 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 1068.101(a)(1).

**ANSWER:**  Diésel Spec admits only that 42 U.S.C. § 7522(a)(1) and 40 C.F.R. § 1068.101(a)(1) are, respectively, statutory and regulatory provisions which speak for themselves, and denies the remaining allegations in Paragraph 33.

34.     Pursuant to 42 U.S.C. § 7547(d), the standards to obtain a COC are the same for a nonroad vehicle as for a motor vehicle in that the manufacturer must demonstrate that the engine will conform to established emissions standards for $NO_R$, PM, NMHCs, and CO, and other pollutants.

**ANSWER:**  Diésel Spec admits only that 42 U.S.C. § 7547(d) is a statutory provision which speaks for itself and denies the remaining allegations in Paragraph 34.

35.     To obtain a COC, an engine manufacturer must submit an application for a COC to EPA for each nonroad engine family and each model year that it intends to manufacture the engine family for introduction into commerce. The COC application must include, among other things, identification of the covered engine family, a description of the nonroad engines and their emission control system, and test results from a test engine or engines showing that the engine family satisfies applicable emissions standards. 40 C.F.R. §§ 1039.201; 1039.205.

**ANSWER:**  Diésel Spec admits only that 40 C.F.R. §§ 1039.201 and 1039.205 are regulatory provisions which speak for themselves and denies the remaining allegations in Paragraph 35.

36.     If, after review of the COC application and other information, EPA determines that the test engine or engines described in the certificate of conformity application meet(s) the requirements of the CAA, EPA will issue a certificate of conformity for the nonroad engine family for that model year. 40 C.F.R. § 1039.255.

**ANSWER:**  Diésel Spec admits only that 40 C.F.R. § 1039.255 is a regulatory provision which speaks for itself and denies the remaining allegations in Paragraph 36.

37.    The provisions of 40 C.F.R. part 1068 apply to land-based nonroad compression-ignition engines that are subject to the provisions of 40 C.F.R. part 1039. 40 C.F.R. § 1068.1(a)(6).

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 37.

### D.    Acts Prohibited by Section 203 of the Clean Air Act

38.    The following acts are prohibited by 42 U.S.C. § 7522(a)(3)(A):

"for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with the regulations [promulgated under Title II of the CAA] prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser."

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 38.

39.    The following acts are prohibited by 42 U.S.C. § 7522(a)(3)(B):

"for any person to manufacture or sell, offer to sell, or install any part or component intended for use with, or as a part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations [promulgated under Title II of the CAA], and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 39.

40.    Additionally, 42 U.S.C. § 7522(a) prohibits any person from causing a violation of 42 U.S.C. § 7522(a)(3)(A) or (B).

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 40.

41.    Any person violating 42 U.S.C. § 7522(a)(3)(A) or (B) is subject to injunctive relief and civil penalties of up to $5,580 for each violation occurring after November 2, 2015, in accordance with Section 205(a) of the CAA. 42 U.S.C. § 7524(a) as modified by 40 C.F.R. § 19.4 (2023); 87 Fed. Reg. 1,988 (Jan. 6, 2023).

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 41.

42.     Each part or component manufactured, sold, offered for sale, or installed in violation of 42 U.S.C. § 7522(a)(3)(B), is a separate violation of 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7524(a) is a statutory provision which speaks for itself and denies the remaining allegations in Paragraph 42.

### E.     Acts Prohibited by Section 213 of the Clean Air Act

43.     The general compliance regulations for nonroad engines, 40 C.F.R. § 1068.101(b)(1) prohibits a person to:

> "remove or render inoperative any device or element of design installed on or in engines/equipment in compliance with the regulations prior to its sale and delivery to the ultimate purchaser. You also may not knowingly remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser."

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 43.

44.     40 C.F.R. § 1068.101(b)(2) also prohibits a person to:

> "knowingly manufacture, sell, offer to sell, or install, any component that bypasses, impairs, defeats, or disables the control of emissions of any regulated pollutant, except as explicitly allowed by the standard-setting part."

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 44.

45.     The regulations also prohibit any person to cause someone to violate 40 C.F.R. § 1068.101(b)(1) or (2). 40 C.F.R. § 1068.101(c); 40 C.F.R. § 1068.101(h).

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 45.

46.     42 U.S.C. § 7547 states that nonroad vehicle and engine standards, "shall be enforced in the same manner as standards prescribed under [42 U.S.C. § 7521,]" for motor vehicles and motor vehicle engines, and that the Administrator "shall revise or promulgate regulations as may be necessary to determine compliance with, and enforce, standards in effect under [42 U.S.C. § 7547]."

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7547 is a statutory provision which speaks

for itself and denies the remaining allegations in Paragraph 46.

47.     Therefore, any person in violation of 40 C.F.R. § 1068.101(b)(1) or (2) is subject to injunctive relief and civil penalties of up to $5,580 for each component, engine, or piece of equipment in violation. 40 C.F.R. § 1068.101(b)(1); 40 C.F.R. § 1068.101(b)(2); 40 C.F.R. § 1068.101(h).

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 47.

### F.     EPA's Information Gathering Authority Under the Clean Air Act

48.     Under 42 U.S.C. § 7542(a), persons subject to Title II, Part A are required to maintain records and to provide information that EPA may reasonably require to determine whether the person has acted or is acting in compliance with the mobile source provisions of the CAA.

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7542(a) is a statutory provision which

speaks for itself and denies the remaining allegations in Paragraph 48.

49.     42 U.S.C. § 7522(a)(2)(A) prohibits a person from failing to provide information required by the section or cause someone to fail to provide such information.

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. § 7522(a)(2)(A) is a statutory provision

which speaks for itself and denies the remaining allegations in Paragraph 49.

50.     Any person violating 42 U.S.C. § 7522(a)(2)(A) is subject to civil penalties of up to $55,808 per day for each violation occurring after November 2, 2015. 42 U.S.C. §§ 7524(a), 7525(a), as modified by 40 C.F.R. § 19.4 (2023).

**ANSWER:**     Diésel Spec admits only that 42 U.S.C. §§ 7524(a) and 7525(a) are statutory

provisions which speak for themselves and denies the remaining allegations in Paragraph 50.

### G.     Emission Control Systems

51.     An "emission control system" for a highway motor vehicle is a "unique group of emission control devices, auxiliary emission control devices, engine modifications and strategies,

and other elements of design designated by the Administrator [of EPA] used to control exhaust emissions of a vehicle." 40 C.F.R. § 86.1803-01.

**ANSWER:**     Diésel Spec admits that Paragraph 51 sets forth, in part, the language contained in

40 C.F.R. § 86.1803-01, and denies the remaining allegations in Paragraph 51.


52.     For a nonroad vehicle, an "emission control system" is similarly defined as "any device, system, or element of design that controls or reduces the emissions of regulated pollutants from an engine." 40 C.F.R. § 1039.801.

**ANSWER:**     Diésel Spec admits that Paragraph 51 sets forth, in part, the language contained in

40 C.F.R. § 1039.801, and denies the remaining allegations in Paragraph 52.


53.     OEMs install a variety of software and hardware elements of design and emission control systems in motor vehicles, motor vehicle engines, nonroad vehicles, and nonroad engines to monitor and control emissions of pollutants in order to comply with the CAA and the regulations promulgated thereunder and to obtain a COC. These elements of design and emission control systems are hereinafter referred to in this Complaint as "Emission Control Systems."

**ANSWER:**     Diésel Spec admits only that Paragraph 53 is an accurate general description of

systems installed by OEMs to obtain a COC but denies the remaining allegations in Paragraph 53.


54.     Emission Control Systems generally include both the specific hardware and the software that controls operation of that hardware.

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 54.


55.     <u>Electronic Control Units.</u> Motor vehicles and nonroad vehicles are equipped with "Electronic Control Units" or "ECUs" (a/k/a an "engine control module" or "ECM"), which are on-board computer systems that run software that monitors and controls vehicle and engine operations, including the operation of Emission Control Systems.

**ANSWER:**     Diésel Spec admits only that Paragraph 55 is an accurate description of equipment

present in some vehicle and engine models but denies that such equipment functions in the manner

described in all cases.

56. <u>Auxiliary Emission Control Devices</u>. Motor vehicles and nonroad vehicles are also equipped with auxiliary emission control devices ("AECDs") which are Emission Control Systems that sense temperature, motor speed, engine revolution per minute (RPM), transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of a motor vehicle's emission control system. 40 C.F.R. § 1037.801 and 1039.801.

**ANSWER:**    Diésel Spec admits only that Paragraph 56 appears to be an accurate summary of

the definition of auxiliary emission control devices contained in the regulations but denies the

remaining allegations in Paragraph 56.

57. <u>Exhaust Gas Recirculation System ("EGR System")</u>. Diesel engines produce high combustion temperatures that result in the production of NOx. An EGR System reduces NOx emissions by recirculating a portion of engine exhaust gas back through the engine's cylinders, thereby lowering combustion temperature and reducing NOx formation.

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 57.

58. The EGR System includes but is not limited to the EGR cooler, throttle valve, other valves, piping, flanges, and gaskets as well as various other hardware, parts, sensors, subassemblies, AECDs, Electronic Control Unit software (calibrations) and other components that collectively constitute the system for implementing this emissions control strategy.

**ANSWER:**    Diésel Spec admits only that Paragraph 58 appears to be a general, broad

description of various components of an EGR System and denies the remaining allegations in

Paragraph 58.

59. The EGR System is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

**ANSWER:**    Diésel Spec admits only that 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 are

regulatory provisions which speak for themselves and denies the remaining allegations in

Paragraph 59.

60. <u>Aftertreatment System</u>. As an alternative or in addition to EGRs, OEMs typically equip motor vehicles and nonroad vehicles with one or more Aftertreatment Systems "whose

design function is to reduce emissions in the engine exhaust before it is exhausted to the environment." *See* 40 C.F.R. § 1068.30.

**ANSWER:**    Diésel Spec admits only that Paragraph 60 appears to accurately quote the

regulation and denies the remaining allegations in Paragraph 60.


61.    A motor vehicle or nonroad vehicle's Aftertreatment System consists of hardware installed in the stock exhaust system, as well as software that runs on one or more Electronic Control Units and directs operation of the hardware components.

**ANSWER:**    Diésel Spec admits only that Paragraph 61 appears to be an accurate description of

the components of an Aftertreatment System in some vehicles but denies the remaining allegations

in Paragraph 61 on the grounds of vagueness.


62.    Diesel Particulate Filters ("DPFs"), Selective Catalytic Reduction ("SCR") Systems, and NO, Adsorption Catalysts ("NACs") are components of the Aftertreatment System that OEMs employ to control the emission of pollutants.

a.    <u>Diesel Particulate Filter ("DPF")</u>. A DPF is a filter that captures particulates or soot from engine exhaust, thereby decreasing PM emissions. By design, soot that collects in the DPF is periodically burned off by elevated exhaust temperatures in a process referred to as active or passive regeneration. The DPF includes all hardware, parts, sensors, subassemblies, AECDs, Electronic Control Unit software (calibrations), and other components that collectively constitute the system for implementing this emissions control strategy.

b.    The DPF is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

c.    <u>Selective Catalytic Reduction ("SCR")</u>. A Selective Catalytic Reduction ("SCR") system (a type of "catalytic converter" or "catalyst") reduces $NO_x$ emissions by chemically converting exhaust gas that contains $NO_x$ into nitrogen and water through the injection of diesel exhaust fluid, typically composed of urea. The SCR includes all hardware, parts, sensors, subassemblies, AECDs, Electronic Control Unit software (calibrations), and other components that collectively constitute the system for implementing this emissions control strategy.

d.    The SCR is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

e.    <u>$NO_x$ Adsorption Catalyst ("NAC")</u>. A $NO_x$ Adsorption Catalyst ("NAC") (a type of "catalytic converter" or "catalyst", a/k/a "NOx trap") reduces NOx emissions by chemically adsorbing $NO_x$ from exhaust gas. The NAC includes all hardware, parts, sensors,

subassemblies, AECDs, Electronic Control Unit software (calibrations), and other components that collectively constitute the system for implementing this emissions control strategy.

        f.     The NAC is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

**ANSWER:**    Diésel Spec admits only that subparagraphs a, c, and e of Paragraph 62 are accurate general descriptions of the components referenced therein. Diésel Spec further admits only that subparagraphs b, d, and f cite regulatory provisions which speak for themselves, and denies the remaining allegations in Paragraph 62.

63.    <u>On Board Diagnostics System</u>. The CAA requires OEMs to install an On-Board Diagnostics system ("OBD") on motor vehicles. 42 U.S.C. § 7521(m). The OBD monitors, detects, reports, and records malfunctions of monitored Emission Control Systems and other components through the controller area network installed throughout the motor vehicle or motor vehicle engine. 40 C.F.R. §§ 86.007-17, 86.010-18, 86.1806-05.

**ANSWER:**    Diésel Spec admits only that 42 U.S.C. § 7521(m) is a statutory provision and 40 C.F.R. §§ 86.007-17, 86.010-18, and 86.1806-05 are regulatory provisions which speak for themselves, and denies the remaining allegations in Paragraph 63.

64.    The OBD monitors sensor inputs for malfunction or deterioration that could cause a vehicle to fail to comply with CAA emission standards and may command the Electronic Control Unit to alter vehicle operation so that malfunctions can be corrected. The OBD System includes hardware, parts, sensors, subassemblies, AECDs, Electronic Control Unit software (calibrations), and other components that collectively constitute the system.

**ANSWER:**    Diésel Spec admits only that Paragraph 64 is an accurate general description of OBD Systems and denies the remaining allegations in Paragraph 64.

65.    The OBD System is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

        a.    CAA regulations require that when the OBD System detects a malfunction of an emissions-related system or component, it must illuminate the vehicle's malfunction indicator light ("MIL" a/k/a "check engine light") on the dashboard. *See* 40 C.F.R. § 86.180605(b)-(d).

b.     CAA regulations require that once the MIL has been illuminated, the OBD must record a diagnostic trouble code ("DTC"). 40 C.F.R. § 86-1806-05(e). The OBD stores DTCs that service personnel can read in order to diagnose and repair a vehicle and government inspectors can download to verify a vehicle's compliance with emissions standards.

c.     The OBD may also prompt a driver to correct a problem by altering vehicle performance, such as by putting the vehicle into "limp-home mode." *See* 40 C.F.R. § 86.010-2. In limp-home mode, the Electronic Control Unit commands the engine to downgrade in performance so that the driver is aware that there is a problem with the emission control system, while permitting the vehicle to be driven (albeit slowly) to a service station. *See, e.g.,* 40 C.F.R. § 86.004-25(b)(6)(ii) (requiring the vehicle performance to deteriorate to a point unacceptable for typical driving when DEF replenishment is required).

**ANSWER:**     Diésel Spec admits only that subparagraphs b and c of Paragraph 65 contain accurate general descriptions of the functions of OBD systems. Diésel Spec further admits only that the remaining allegations of Paragraph 65 and its subparagraphs cite regulatory provisions which speak for themselves and denies the remaining allegations in Paragraph 65.

66.     <u>Certified Stock Calibrations.</u> OEMs install a suite of pre-set software calibrations for operational parameters ("Certified Stock Calibrations"). These Calibrations control all aspects of vehicle and engine operation including combustion, performance, and operation of EGR and Aftertreatment Systems. The Certified Stock Calibrations for a particular engine operate together to minimize and/or control the formation and emission of pollutants and ensure the motor vehicle or motor vehicle engine can meet applicable emissions requirements in the CAA and regulations promulgated thereunder.

**ANSWER:**     Diésel Spec admits only that Paragraph 66 is an accurate general description of the functions of Certified Stock Calibrations and denies the remaining allegations in Paragraph 66.

67.     Each Certified Stock Calibration is an element of design within the meaning of 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 and is an Emission Control System.

**ANSWER:**     Diésel Spec admits only that 40 C.F.R. § 86.1803-01 and 40 C.F.R. § 1039.801 are regulatory provisions which speak for themselves and denies the remaining allegations in Paragraph 67.

68.     Parameters that affect the operation of the Emission Control System(s) include the following:

a.     calibrations for parameters that affect the operation of the EGR System including EGR flowrate and EGR cooler bypassing;

b.     calibrations for parameters that affect the operation of Aftertreatment System (the DPF, SCR, and/or NAC);

c.     calibrations for parameters that affect engine combustion, performance, and operation, including air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pulse width, fuel injection pressure, fuel injection mass, multiple injection patterns, open loop/closed loop functionality and control, ignition control (spark timing), boost pressure, limiters (fuel, torque, smoke, etc.), manifold pressure, camshaft timing, electronic throttle control, engine air flow characteristics, mass air flow rate, turbocharger/supercharger air flow, and other parameters disclosed on the COC which are elements of the OEM's strategy to control the formation of pollutants in the engine.

d.     calibrations for parameters that affect OBD detection, warning, and recording of malfunctions.

**ANSWER:**     Diésel Spec admits only that Paragraph 68 contains an accurate general description of parameters that can affect Emission Control Systems and denies the remaining allegations in Paragraph 68.

## H.     Types of Aftermarket Products at Issue in this Case

69.     Third-parties, including Defendant, manufacture, sell, and offer for sale products for use with existing motor vehicles and nonroad vehicles that are designed to enhance the vehicle's power, performance, or fuel economy (hereinafter "Aftermarket Performance Products").

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 69.

70.     Defendant's Aftermarket Performance Products achieve their purpose by replacing, modifying, bypassing, rendering inoperative, facilitating deletion or partial deletion of, interfering with, and/or over-writing OEM-installed Emission Control Systems.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 70.

71.    Defendant's Aftermarket Performance Products "bypass, defeat, or render inoperative" Emission Control Systems within the meaning of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. §§ 1068.101 (b)(1) and (2).

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 71.

72.    Specifically, Defendant sells three types of Aftermarket Performance Products: EGR Blocker Plates, Handheld Tuners, and Defeat Tunes.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 72.

73.    <u>EGR Blocker Plates.</u> These aftermarket hardware products physically replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, and/or interfere with, components of the EGR System. These products are referred to in this Complaint as "EGR Blocker Plates."

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 73.

74.    <u>Handheld Tuners.</u> These aftermarket defeat devices are small handheld devices that are connected to a motor vehicle or nonroad vehicle to upload Defeat Tunes on to the vehicle's Electronic Control Unit.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 74.

75.    <u>Tunes.</u> These aftermarket products consist of software that is uploaded into a vehicle's Electronic Control Unit and replaces, modifies, bypasses, renders inoperative, facilitates deletion or partial deletion of, overwrites, and/or interferes with one or more of a vehicle's or engine's Certified Stock Calibrations.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 75.

76.    An individual piece of such software is commonly referred to as a "Tune," derived from its intended purpose of "tuning" the vehicle's performance. The Tunes relevant to this Complaint are referred to herein as "Defeat Tunes."

**ANSWER:**    Diésel Spec admits only the common usage of the term "Tune" to refer to

performance efficiency tunes and denies the remaining allegations in Paragraph 76, including, but

not limited to, the Government's use of the term "Defeat Tunes," which is a term of art seemingly created by the Government and not utilized by Diésel Spec.

77.     There are various methods by which Defeat Tunes may be programmed into the vehicle. Tunes may be uploaded from a handheld tuner, or from a smartphone or laptop to which they are uploaded by email, or through cloud-based technology.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 77.

78.     A single Defeat Tune can alter, disable, bypass, delete, and/or over-write multiple Certified Stock Calibrations and types of Certified Stock Calibrations. For example, a tune that disables the EGR also typically changes OBD-related calibrations so that the EGR deletion will not be detected.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 78.

79.     The Defeat Tunes relevant to this Complaint delete, modify, or overwrite Certified Stock Calibrations relating to the:

        a.     EGR System;

        b.     Aftertreatment Systems including the DPF, SCR, or NAC;

        c.     engine combustion, performance, and operation; or

        d.     OBD functions.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 79.

## V.  GENERAL ALLEGATIONS

### A.     Diesel Spec's Business

80.     From at least September 2018 through May 2022, Defendant has sold thousands of Defeat Devices to and through at least 79 distributors located across the United States, including at least 10 in Ohio, in violation of 42 U.S.C. § 7522(a)(3).

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 80.

81.     During that same time, Defendant sold and shipped Defeat Devices directly to individuals and end users located in the United States, including in Ohio, who are not Diesel Spec distributors.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 81.


82.     While Defendant has sold and shipped products to addresses from coast to coast, Defendant has operated a substantial business within the State of Ohio.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 82.


83.     From on or about September 2018 through May 2019, Defendant imported at least 141 shipments to addresses located in the State of Ohio.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 83.  Answering further, Diésel Spec states that it lacks information sufficient to admit or deny the specific numeric allegations concerning the sale of its products or services to entities within the United States, as many relevant records created prior to November 16, 2021, were seized by the Canadian authorities at the direction of the United States Environmental Protection Agency on November 16, 2021. Diésel Spec lacks access to certain records as they are currently in the possession of the Canadian authorities.


84.     At least 104 of those shipments contained Defeat Devices.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 84.


85.     From on or about September 2018 through May 2019, Defendant imported shipments to at least 10 different Diesel Spec distributors located in the State of Ohio.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 85.


86.     During that time, Defendant also imported shipments containing Defeat Devices to individuals, who are not apparently Diesel Spec distributors, located in the State of Ohio on at least 10 occasions.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 86.

87.     Additionally, from on or about March 2018 through December 2022, Diesel Spec sold hundreds of remote tunes into the United States, including in Ohio.

**ANSWER:** Diésel Spec admits that tuning products were sold to distributors or customers in the United States during the referenced time frame and denies the remaining allegations in Paragraph 87.

88.     For instance, Defendant sold at least 300 remote tunes to and through one distributor, NRG Repair LLC d/b/a J.B. Truck Service & Parts Inc., which is located in Coldwater, Ohio.

**ANSWER:** Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 88, and therefore denies such allegations on that basis.

89.     On its website, individuals and companies who are interested in selling Diesel Spec products can apply to become distributors. Upon information and belief, once approved, Diesel Spec dealers receive a login for the Diesel Spec internal website.

**ANSWER:** Diésel Spec admits that companies interested in selling its products can apply to become distributors on its website and may receive login information if approved. Diésel Spec denies the remaining allegations in Paragraph 89, including the allegation that individuals are eligible to become distributors.

90.     Upon information and belief, when customers visit the Diesel Spec website looking to purchase products, they can click the "find a dealer" link to be connected with a Diesel Spec distributor in a prospective customer's local area.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 90.

91.     Diesel Spec's website (www.dieselspec.com/contact-us/) states (or stated) that it has the best after sale support in the market with 15 employees dedicated to providing support to customers after purchase, including offering a 30-day money-back satisfaction guarantee.

**ANSWER:** Diésel Spec admits the allegations in Paragraph 91.

### B.    Defeat Devices

92.    From at least September 2018 through May 2022, Defendant violated the Clean Air Act by selling, offering for sale, and installing Defeat Devices for use in vehicles or engines in the United States.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 92.

93.    At all relevant times herein, Defendant sold, offered to sell, and/or installed products intended for use in "motor vehicles" and "nonroad vehicles" as those terms are defined by the CAA, 42 U.S.C. § 7550(2) and (11).

**ANSWER:** Diésel Spec admits the allegations in Paragraph 93.

94.    Many of the products that Defendant sold, offered to sell, or installed in the United States are Defeat Devices.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 94.

95.    Defendant claims the Defeat Devices enhance a vehicle's power or performance, "maximize" a vehicle's fuel economy, and reduce the costs associated with maintaining a vehicle's emission control system.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 95.

96.    At all relevant times herein, Defendant sold, offered to sell, and/or installed Defeat Devices individually and through its network of distributors in the United States.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 96.

97.    At all relevant times herein, Defendant, individually and through its network of distributors, also provided after-sale service and support for the Defeat Devices.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 97.

98.     At all relevant times herein, Defendant sold, offered for sale, or installed in the United States, or caused the selling, offering for sale, or installing in the United States, the following types of Defeat Devices: EGR Blocker Plates, Handheld Tuners, and Defeat Tunes.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 98.

99.     At all relevant times herein, the EGR Blocker Plates, Handheld Tuners, and Defeat Tunes that Defendant sold, offered for sale, or installed in the United States, or that Defendant caused to be sold, offered for sale, or installed in the United States, had a principal effect of bypassing, defeating, and/or rendering inoperative Emission Control Systems.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 99.

100.    At all relevant times herein, Defendant knew that the one or more of the EGR Blocker Plates, Handheld Tuners, and/or Defeat Tunes it sold, offered for sale, or installed in the United States, or the causing thereof, were intended for use with or as a part of a motor vehicle, nonroad vehicle, motor vehicle engine, and/or nonroad engine and had a principal effect of bypassing, defeating, and/or rendering inoperative Emission Control Systems.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 100.

### C.     Requests for Information

101.    On March 23, 2018, pursuant to 42 U.S.C. § 7542(a), EPA hand delivered a request for information to Ian Rees while he was attending the Mid-America Truck Show located in Louisville, Kentucky.

**ANSWER:**     Diésel Spec admits only that on March 23, 2018, Ian Rees was approached by an individual while attending the Mid-America Truck Show in Louisville, Kentucky and handed a document that purported to be a request for information. Diésel Spec denies the remaining allegations in Paragraph 101.

102.    Ian Rees was the General Manager of Diesel Spec and an agent of Diesel Spec.

**ANSWER:**     Diésel Spec admits the allegations in Paragraph 102.

103.    The information requested by EPA included information about each product that Defendant manufactured or sold after January 1, 2015 that "(a) Changes, affects, modifies,

bypasses, or renders inoperative any emission control component, element of design, or emission related part...b) Simulates the operation of any emission control component and/or related parts...and/or (c) Can be programed to modify engine operating parameters, such as injection timing, fuel pressure, and/or pulse width, emission control parameters, or OBD functions."

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 103.


104.    This information request directed Diesel Spec to provide this information within 30 days.

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 104.


105.    Diesel Spec did not provide the requested information by the due date of April 23, 2018.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 105. Answering further, Diésel Spec states that it is not subject to the provisions of the CAA relating to requests for information, and that it was prohibited from providing documents to the United States pursuant to the Québec Business Concerns Records Act.


106.    On September 24, 2018, in coordination with the U.S. Consulate General in Montreal, Environment and Climate Change Canada (ECCC), and the Quebec Ministry of Sustainable Development, Environment, and the Fight Against Climate Change, representatives from EPA traveled to Defendant Diesel Spec's facility in Quebec to discuss Defendant's failure to respond to the March 23, 2018 information request.

**ANSWER:**    Diésel Spec admits that on September 6, 2018 (not September 24), representatives of the EPA visited its facility to discuss the information request. Diésel Spec lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 106, and therefore denies such allegations on that basis.


107.    At the September 24, 2018 meeting, EPA representatives reiterated to Diesel Spec representatives that responding to the information request was mandatory and set another 30-day period for a response.

**ANSWER:**     Diésel Spec admits that on September 6, 2018 (not September 24), representatives of the EPA visited its facility to discuss the information request. Diésel Spec admits the remaining allegations in Paragraph 107.

108.     Diesel Spec agreed to reach out to investigators within one week to provide a timeline of when it would be able to respond to the request.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 108.

109.     As of the date of this Complaint, Diesel Spec has not provided any information responsive to the March 23, 2018 information request.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 109. Answering further, Diésel Spec states that it is not subject to the provisions of the CAA relating to requests for information, and that it was prohibited from providing documents to the United States pursuant to the Québec Business Concerns Records Act.

## FIRST CLAIM FOR RELIEF

### *Violations of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101(b)(2)*
### *Sale and/or Offer to Sell EGR Blocker Plates*

110.     The United States re-alleges Paragraphs 1 through above as if fully set forth herein.

**ANSWER:**     Diésel Spec realleges and incorporates by reference its answers to each of the Paragraphs 1 through 109 above of this Complaint as its answers to this Paragraph 110.

111.     Since at least 2018, Defendant sold and/or offered for sale, and/or caused the sale, and/or offering for sale of in the United States, EGR Blocker Plates that replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, and/or interfere with the EGR System (hereinafter "Defendant's EGR Blocker Plates").

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 111.

112.    Through at least September 2022, Defendant sold products on its website advertised as "EGR Delete Kits for Trucks" which contain EGR Blocker Plates that interfere with the functioning of the EGR System.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 112.


113.    From September 2018 through May 2022, Defendant sent over 1000 shipments into the United States containing EGR Blocker Plates.

**ANSWER:**    Diésel Spec lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 113, and therefore denies such allegations on that basis.


114.    A motor vehicle's EGR System is "a device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of 42 U.S.C. § 7522(a)(3)(B).

**ANSWER:**    Diésel Spec admits only that 42 U.S.C. § 7522(a)(3)(B) is a statutory provision which speaks for itself and denies the remaining allegations in Paragraph 114.


115.    Each of Defendant's EGR Blocker Plates is, and at all relevant times herein was, intended for use with certified motor vehicles, motor vehicle engines, and nonroad vehicles and engines subject to COC requirements under 40 C.F.R. Part 1039, including Caterpillar, Cummins, Detroit, Isuzu, Mercedes, and Paccar engines.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 115.


116.    A principal effect of each of Defendant's EGR Blocker Plates is, and at all relevant times herein was, to bypass, defeat, or render inoperative a motor vehicle's or nonroad vehicle's EGR System.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 116.


117.    Defendant knew or should have known that each of Defendant's EGR Blocker Plates was intended for use with or as a part of any motor vehicle, motor vehicle engine, nonroad vehicle, and/or nonroad engine and had a principal effect of bypassing, defeating, and/or rendering inoperative, Emission Control Systems.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 117.

118.     As of the date of this complaint, Defendant continues to offer Defendant's EGR Blocker Plates for sale in the United States.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 118. Answering further, Diésel Spec states that it ceased any and all sales of its products and services to customers in the United States on December 22, 2022, and notified the United States of this cessation prior to the filing of the Complaint.

119.     Each of Defendant's EGR Blocker Plates intended for use in a motor vehicle, that Defendant sold and/or offered for sale in the United States, or the causing thereof, is a separate violation of 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

**ANSWER:**     Paragraph 119 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 119.

120.     Each of Defendant's EGR Blocker Plates, intended for use in a nonroad vehicle, that Defendant sold and/or offered for sale in the United States, or the causing thereof, is a separate violation of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101(b)(2).

**ANSWER:**     Paragraph 120 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 120.

121.     For each violation of 42 U.S.C. § 7522(a)(3)(B), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 41.

**ANSWER:**     Paragraph 121 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 121.

122.     For each violation of 40 C.F.R. § 1068.101(b)(2), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 47 above.

**ANSWER:**     Paragraph 122 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 122.

## SECOND CLAIM FOR RELIEF

### *Violations of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101 (b)(2)*
### *Sale and/or Offer to Sell Handheld Tuners*

123.    The United States re-alleges Paragraphs 1 through 109 above as if fully set forth herein.

**ANSWER:**    Diésel Spec realleges and incorporates by reference its answers to each of the

Paragraphs 1 through 109 above of this Complaint as its answers to this Paragraph 123.

124.    Since at least 2018, Defendant sold and/or offered for sale, and/or caused the sale and/or offer for sale of in the United States, Handheld Tuners that enable a distributor or final purchaser to upload Defeat Tunes to a vehicle to alter or overwrite Certified Stock Calibrations.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 124.

125.    Each Certified Stock Calibration is an "element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of 42 U.S.C. § 7522(a)(3)(B) or a "device or element of design installed on or in engines/equipment in compliance with the regulations" within the meaning of 40 C.F.R. § 1068.101(b)(1).

**ANSWER:**    Diésel Spec admits only that 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R.

§ 1068.101(b)(1) are, respectively, statutory and regulatory provisions which speak for

themselves, and denies the remaining allegations in Paragraph 125.

126.    Each of Defendant's Handheld Tuners is, and at all relevant times herein was, intended for use with certified motor vehicles and motor vehicle engines or nonroad vehicles and engines subject to the requirements of 40 C.F.R. Part 1039.

**ANSWER:**    Diésel Spec admits only that 40 C.F.R. Part 1039 is a regulatory provision which

speaks for itself and denies the remaining allegations in Paragraph 126.

127.    Some of Defendant's Handheld Tuners are compatible for use with Cummins, Detroit, International, Isuzu, Mercedes, and Paccar engines in diesel trucks.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 127.

128.    Others of Defendant's Handheld Tuners are compatible for use with DeCase, Challenger, Claas, Fendt, John Deere, Massey Ferguson, New Holland, Valtra, Caterpillar, and Steyr engines in agricultural equipment; and Case, JCB, John Deere, New Holland, Caterpillar, Bobcat, Hitachi, and Komatsu engines in construction equipment.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 128.

129.    A principal effect of each of Defendant's Handheld Tuners is, and at all relevant times herein was, to bypass, defeat or render inoperable a Certified Stock Calibration related to a motor vehicle's EGR System, Aftertreatment System, engine operation and combustion, and/or OBD System.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 129.

130.    Defendant knew or should have known that each of Defendant's Handheld Tuners was compatible for use with or as a part of any motor vehicle, motor vehicle engine, nonroad vehicle, or nonroad engine and had a principle [sic] effect of bypassing, defeating, and/or rendering inoperative Emission Control Systems.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 130.

131.    From September 2018 through May 2022, Defendant shipped more than 50 shipments to the United States containing Handheld Tuners.

**ANSWER:**    Diésel Spec lacks knowledge or information sufficient to admit or deny the specific numeric allegations in Paragraph 131 concerning the sale of its products or services to entities within the United States, as many relevant records created prior to November 16, 2021, were seized by the Canadian authorities at the direction of the United States Environmental Protection Agency on November 16, 2021, and therefore denies such allegations on that basis. Diésel Spec denies the remaining allegations in Paragraph 131.

132.    Each of Defendant's Handheld Tuners compatible for use on a motor vehicle or motor vehicle engine is a separate violation of 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

**ANSWER:**    Paragraph 132 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 132.

133. Each of Defendant's Handheld Tuners compatible for use on a nonroad vehicle or nonroad engine is a separate violation of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101 (b)(2).

**ANSWER:** Paragraph 133 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 133.

134. As of the date of this complaint, Defendant continues to offer Defendant's Handheld Tuners for sale in the United States.

**ANSWER:** Diésel Spec denies the allegations in Paragraph 134.

135. For each violation of 42 U.S.C. § 7522(a)(3)(B), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 41 above.

**ANSWER:** Paragraph 135 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 135.

136. For each violation of 40 C.F.R. § 1068.101(b)(1) or (2), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 47 above.

**ANSWER:** Paragraph 136 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 136.

## THIRD CLAIM FOR RELIEF

### *Violations of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101(b)(2)*
### *Sale and/or Offer to Sell Defeat Tunes*

137. The United States re-alleges Paragraphs 1 through 109 above as if fully set forth herein.

**ANSWER:** Diésel Spec realleges and incorporates by reference its answers to each of the Paragraphs 1 through 109 above of this Complaint as its answers to this Paragraph 137.

138.     Since at least 2018, Defendant sold and/or offered for sale, or caused the sale and/or offer for sale, hundreds of different types of Defeat Tunes (hereinafter "Defendant's Defeat Tunes") in the United States.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 138.


139.     Some of Defendant's Defeat Tunes altered or overwrote multiple Certified Stock Calibrations.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 139.


140.     Defendant's Defeat Tunes delete, modify, and/or overwrite one or more of the following types of Certified Stock Calibrations:

        a.     Certified Stock Calibrations relating to the EGR System, as well as signals or records related to the EGR System.

        b.     Certified Stock Calibrations relating to the Aftertreatment System, including the DPF, SCR, or NAC, as well as signals or records related to these components.

        c.     Certified Stock Calibrations related to engine combustion, performance, and operation such as air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pressure, and fuel injection pulse width.

        d.     Certified Stock Calibrations related to OBD functions in order to prevent the generation of diagnostic trouble codes, prevent the malfunction indicator light from illuminating, and/or prevent the OBD from putting the vehicle into "limp-home mode" due to changes in Certified Stock Calibrations or removal of the EGR System or Aftertreatment System.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 140.


141.     Some of Defendant's Defeat Tunes replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, over-write, and/or interfere with operation of the EGR System, Aftertreatment System, Certified Stock Calibrations, and the OBD System.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 141.


142.     For example, Defendant's websites recognize the emissions-reduction benefits of these Emission Control Systems and provide information about the Defeat Tunes Defendant offers for sale.

**ANSWER:**     Diésel Spec denies the allegations in Paragraph 142.

143.    Appendix A contains image captures from the Defendant's website showing how it promotes its Defeat Tunes for motor vehicles.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 143.

144.    Appendix B contains statements that appear (or appeared) on the Defendant's agriculture and construction websites promoting its Defeat Tunes for nonroad vehicles.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 144.

145.    From September 2018 through May 2022, Defendant shipped more than 950 shipments into the United States containing Electronic Control Units on which Defendant had installed Defeat Tunes.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 145.

146.    Defendant fulfills some orders of Defeat Tunes electronically by installing the altered code to the Electronic Control Units remotely; therefore, the number of sales is likely higher than 950.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 146.

147.    Defendant has not provided any information to the United States regarding the orders of Defeat Tunes fulfilled to customers in the United States.

**ANSWER:**    Diésel Spec admits the allegations in Paragraph 147 as Diésel Spec does not sell "Defeat Tunes."

148.    Each of Defendant's Defeat Tunes meant for installation in a motor vehicle or motor vehicle engine is a separate violation of 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

**ANSWER:**    Paragraph 148 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 148.

149.    Each of Defendant's Defeat Tunes meant for installation in a nonroad vehicle or nonroad engine is a separate violation of 42 U.S.C. § 7522(a)(3)(B) and 40 C.F.R. § 1068.101 (b)(2).

**ANSWER:**    Paragraph 149 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 149.

150.    As of the date of this Complaint, Defendant continues to offer Defendant's Defeat Tunes for sale into the United States.

**ANSWER:**    Diésel Spec denies the allegations in Paragraph 150.

151.    For each violation of 42 U.S.C. § 7522(a)(3)(B), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 41 above.

**ANSWER:**    Paragraph 151 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 151.

152.    For each violation of 40 C.F.R. § 1068.101(b)(1) or (2), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 47 above.

**ANSWER:**    Paragraph 152 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 152.

## FOURTH CLAIM FOR RELIEF

*Violations of 42 U.S.C. § 7522(a)(3)(A) and 40 C.F.R. § 1068.101(b)(1)*
*Removing or Rendering Inoperative Emission Control Systems*

153.    The United States re-alleges Paragraphs 1 through 109 above as if fully set forth herein.

**ANSWER:**    Diésel Spec realleges and incorporates by reference its answers to each of the Paragraphs 1 through 109 above of this Complaint as its answers to this Paragraph 153.

154.    Since at least 2018, and continuing thereafter, Defendant installed, or caused persons (including, but not limited to, their employees, distributors, and customers) to install, Defeat Tunes on or in motor vehicles, motor vehicle engines, nonroad vehicles, and/or nonroad engines after the sale and delivery of the vehicle and/or engine to the ultimate purchaser in the United States.

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 154.


155.   There are two primary methods in which Defendant installed, or caused persons (including, but not limited to, their employees, distributors, and customers) to install, Defeat Tunes.

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 155.


156.   First, in some instances Defendant's distributors or customers would remove a vehicle's Electronic Control Unit and ship it to Defendant's shop in Canada where Defendant, by and through its employees, would modify the Electronic Control Unit by installing Defeat Tunes before shipping it back to the distributor or customer for reinstallation in the vehicle in the United States (hereinafter referred to as "manual installation").

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 156.


157.   Additionally, Defendant installed Defeat Tunes by having its distributors or customers send the vehicles unmodified Electronic Control Unit data wherein Defendant, by and through its employees, would modify the Electronic Control Unit by installing Defeat Tunes and send it back to the distributor or customer for upload onto the Electronic Control Unit located in the United States (hereinafter referred to as "remote installation").

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 157.


158.   Defendant installed (or caused to be installed), either through manual or remote installation, Defeat Tunes on vehicles and/or engines located in the United States, in order to render inoperative devices or elements of design in those vehicles and/or engines that were installed to comply with CAA regulations.

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 158.


159.   Defendant knew that the installation of Defeat Tunes, either through manual or remote installation, removed or rendered inoperative devices or elements of design that were being installed for such use or put to such use.

**ANSWER:**   Diésel Spec denies the allegations in Paragraph 159.

160.    Each installation of the Defeat Tunes by, or caused by, Defendant, either through manual or remote installation, on each motor vehicle or motor vehicle engine constitutes a separate violation of 42 U.S.C. § 7522(a)(3)(A).

**ANSWER:**    Paragraph 160 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 160.

161.    Each installation of Defeat Tunes by, or caused by, Defendant, either through manual or remote installation, on each nonroad vehicle or nonroad engine constitutes a separate violation of 42 U.S.C. § 7522(a)(3)(A) and 40 C.F.R. § 1068.101(b)(1).

**ANSWER:**    Paragraph 161 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 161.

162.    For each violation of 42 U.S.C. § 7522(a)(3)(A), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 41 above.

**ANSWER:**    Paragraph 162 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 162.

163.    For each violation of 40 C.F.R. § 1068.101(b)(1), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 47 above.

**ANSWER:**    Paragraph 163 states a legal conclusion to which no response is required. To the extent a response is required, Diésel Spec denies the allegations in Paragraph 163.

### FIFTH CLAIM FOR RELIEF

*Violations of 42 U.S.C. § 7542(a)*
*Failure to Respond to Request for Information Pursuant to 42 U.S.C. § 7542*

164.    The United States re-alleges Paragraphs 1 through 109 above as if fully set forth herein.

**ANSWER:**    Diésel Spec realleges and incorporates by reference its answers to each of the Paragraphs 1 through 109 above of this Complaint as its answers to this Paragraph 164. Answering

further, Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

165.     Defendant is a person subject to Part A (Motor Vehicle Emission and Fuel Standards) of Subchapter II of the CAA.

**ANSWER:**     Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

166.     EPA's March 23, 2018 Request for Information required Defendant to provide information regarding each product it manufactured or sold after January 1, 2015 in order to determine if it was in compliance with the CAA pursuant to its authority under 42 U.S.C. § 7522(a)(2)(A).

**ANSWER:**     Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

167.     Defendant failed to provide any information required by EPA's Request for Information.

**ANSWER:**     Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

168.     Each of Defendant's failures to provide information required by EPA's Request for Information is a violation of 42 U.S.C. § 7542(a).

**ANSWER:**     Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

169.     For each violation of 42 U.S.C. § 7542(a), Defendant is liable to the United States for injunctive relief and civil penalties as set forth in Paragraph 50 above.

**ANSWER:**     Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17), and as such, no answer is required.

## RELIEF REQUESTED

A.      Permanently enjoin Defendant from selling, offering to sell, or installing motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine in the United States where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle, motor vehicle engine, nonroad vehicle, or nonroad engine in compliance with the CAA;

**ANSWER:**    Diésel Spec denies that the Government is entitled to injunctive relief. Answering further, the Government's request for relief is mooted by the fact that Diésel Spec has halted any and all sales of products or services to customers in the United States as of December 22, 2022.

B.      Order Defendant to respond fully and completely to EPA's March 23, 2018 information request;

**ANSWER:**    Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17). As such, no remaining Counts of the Complaint, if successfully proven, would entitle the Government to the requested relief.

C.      Order Defendant to take other appropriate actions to remedy, mitigate, and offset the harm caused by their alleged CAA violations in the United States;

**ANSWER:**    Diésel Spec denies that the Government is entitled to the requested relief.

D.      Assess civil penalties against Defendant for each part or component Defendant sold and shipped into the United States, or caused the selling thereof, in violation of 42 U.S.C. § 7522(a)(3)(B), of up to $5,580 for each violation;

**ANSWER:**    Diésel Spec denies that the Government is entitled to the requested relief.

E.      Assess civil penalties against Defendant for each part or component Defendant sold and shipped into the United States, or caused the selling thereof, in violation of 42 U.S.C. § 7547(a) and 40 C.F.R. § 1068.101(b)(1) or (2) of up to $5,580 for each violation;

**ANSWER:**    Diésel Spec denies that the Government is entitled to the requested relief.

F.      Assess civil penalties against Defendant for each motor vehicle or engine in the United States on which Defendant removed or rendered inoperative or caused to remove or render inoperative a device or element of design in violation of 42 U.S.C. § 7522(a)(3)(A) and (B), of up to $5,580 for each violation;

**ANSWER:**      Diésel Spec denies that the Government is entitled to the requested relief.


G.      Assess civil penalties against Defendant for each nonroad vehicle or nonroad engine in the United States on which Defendant removed or rendered inoperative any device or element of design installed in compliance with the regulations in violation of 42 U.S.C. § 7547(a) and 40 C.F.R. § 1068.101(b)(1) or (2) in the amount up to $5,580 for each violation;

**ANSWER:**      Diésel Spec denies that the Government is entitled to the requested relief.


H.      Assess civil penalties against Defendant for failure to provide a timely response to EPA's Information Request of up to $55,808 per day pursuant to 42 U.S.C. §7522(a)(2)(A); 42 U.S.C. §§ 7524(a), as modified by 40 C.F.R. § 19.4 (2022);

**ANSWER:**      Count V of the Government's Complaint was dismissed by this Court on March 29, 2024 (Doc. 17). As such, no remaining Counts of the Complaint, if successfully proven, would entitle the Government to the requested relief.


I.      Award the United States its costs and disbursements in this action; and

**ANSWER:**      Diésel Spec denies that the Government is entitled to the requested relief.


J.      Award such other and further relief as the Court may deem just and proper.

**ANSWER:**      Diésel Spec denies that the Government is entitled to the requested relief.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any issue where it would not otherwise lie, Diésel Spec pleads the following affirmative defenses. Diésel Spec expressly reserves the right to amend and to assert other and additional affirmative and other defenses during or after completion of discovery:

### Affirmative Defense No. 1

The allegations of the Complaint are inadequately pled and fail to state a cause of action against Diésel Spec under 42 U.S.C. §§ 7522-24 or any other provision of the CAA.

### Affirmative Defense No. 2

Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec, and therefore its relevant conduct for purposes of the sales and other activities alleged in the Complaint occurred in Québec. Accordingly, Diésel Spec lacks minimum contacts with this forum, and the Court lacks personal jurisdiction over Diésel Spec.

### Affirmative Defense No. 3

Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec, and therefore its relevant conduct for purposes of the sales and other activities alleged in the Complaint occurred in Québec. Accordingly, the Government has selected an improper venue for this proceeding.

### Affirmative Defense No. 4

Diésel Spec is a Québec corporation, the sole location of which is located in the Province of Québec and therefore its relevant conduct for purposes of the sales and other activities alleged in the Complaint occurred in Québec. Accordingly, this action should be dismissed under the doctrine of forum non conveniens.

**<u>Affirmative Defense No. 5</u>**

Diésel Spec is not a "person" within the meaning of 42 U.S.C. § 7602(e), or any other provision of the CAA, and therefore is not a proper defendant in this action.

**<u>Affirmative Defense No. 6</u>**

To the extent any of the Government's claims require that Diésel Spec possess knowledge or awareness that its acts or omissions, or the use of its products or services by third parties, resulted in violations of the statutory or regulatory provisions of the CAA, Diésel Spec lacked such knowledge or awareness.

**<u>Affirmative Defense No. 7</u>**

The Government's claims are barred by the doctrine of laches as a result of its inexcusable and unreasonable delay in asserting a claim against Diésel Spec.

**<u>Affirmative Defense No. 8</u>**

All or part of the Government's claims are barred by the doctrines of estoppel, waiver and/or unclean hands.

**<u>Affirmative Defense No. 9</u>**

To the extent that any harm has occurred as the result of acts or omissions of Diésel Spec the Government has failed to exercise reasonable care and diligence to mitigate the alleged harm, and as a result any recovery pursuant to the Government's claims must be reduced, excused, and/or discharged.

**<u>Affirmative Defense No. 10</u>**

Some or all of the Government's claims may be barred by the statute of limitations pursuant to 28 U.S.C. § 2462.

**<u>Affirmative Defense No. 11</u>**

To the extent that Diésel Spec's products or services have been used in violation of 42 U.S.C. §§ 7522-24, or any other provision of the CAA, those violations were caused solely by acts or omissions of third parties other than employees or agents of Diésel Spec, or by a third party whose act or omission did not occur in connection with a contractual relationship with Diésel Spec.

**<u>Affirmative Defense No. 12</u>**

The Government's requests that this Court permanently enjoin Diésel Spec from selling, offering to sell, or installing motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine in the United States. This request is mooted in that Diésel Spec no longer sells its products or services to customers in the United States, a fact which was communicated to the United States prior to the filing of this Complaint.

**<u>Affirmative Defense No. 13</u>**

In the event that the Government is granted leave to reinstate Count V of its Complaint, Diésel Spec reserves the right to assert the following affirmative defense. Granting the Government the requested injunctive relief pursuant to 42 U.S.C. § 7542 would require that Diésel Spec violate the Québec Business Concerns Records Act ("QBCRA").

**<u>Affirmative Defense No. 14</u>**

In the event that the Government is granted leave to reinstate Count V of its Complaint, Diésel Spec reserves the right to assert the following affirmative defense. Granting the

Government the requested injunctive relief pursuant to 42 U.S.C. § 7542 would require that Diésel

Spec produce records currently in the possession of the Canadian authorities, and no longer in the

possession, custody, or control of Diésel Spec.

### Affirmative Defense No. 15

Diésel Spec reserves the right to assert additional affirmative defenses in the event

discovery indicates such defenses may be appropriate.


DATE: April 26, 2024                    /s/ *Thomas N. Zahrt*


Michael J. Hughes (mhughes@nge.com)
Jonathan S. Quinn (jquinn@nge.com)
Thomas N. Zahrt (tzahrt@nge.com)
NEAL, GERBER & EISENBERG, LLP
2 N. LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: (312) 269-8000
*Admitted Pro Hac Vice*

Adam S. Nightingale (0079095)
(asnightingale@eastmansmith.com)
EASTMAN & SMITH LTD.
One SeaGate, 27th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Telephone: (419) 241-6000


Attorneys for Defendant Diésel Spec Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 26, 2024, he caused a copy of the **ANSWER AND AFFIRMATIVE DEFENSES OF DIÉSEL SPEC INC. TO THE COMPLAINT OF THE UNITED STATES OF AMERICA** to be filed via this Court's CM/ECF System, which will send automatic notices to the attorneys of record.

<u>/s/ *Thomas N. Zahrt*</u>